Good morning, Your Honor. Todd Burns on behalf of Mr. Chen. My plan this morning, unless the Court points me in another direction, is to address the first two issues raised in the briefs, which are the theory of defense instruction and the due process straddling issues. I intend to address them separately, but it's dawned on me that there is a way in which they interact that is useful to consider that I didn't emphasize in my brief, so I want to get to that after I address them separately. First, regarding the theory of defense instruction. Mr. Chen requested an instruction to the effect of, if he was pretending to conspire, that he could not be convicted of conspiracy. He didn't have the intent necessary to be convicted of a conspiracy. And there was ample evidence to support that. There was, of course, Mr. Chen's testimony. There was also the fact that with respect to the drug conspiracy, nothing happened with respect to either conspiracy. Nothing much happened over the course of a year, nothing really solid. With respect to the drug conspiracy, Mr. Chen didn't seem to really know much at all about how these things would operate. He didn't even know the going price for drugs, which is a very basic thing that any agent going in an undercover operation would certainly know so as not to blow their cover. With respect to the missile conspiracy, I mean, there was a whole bunch of nonsense about the president of Cambodia, the defense minister of Paraguay, et cetera, et cetera. And if you read through the record, something that's hard to express, you know, in one site here, one site there, but Chen and Wu come off as buffoons, not as sophisticated arms. But the instructions that were given, though, did include the element of intent. Well, they did. And so the government's position is, well, the instructions that were given covered this, and the point there being that the jury would have understood that this was a viable defense. Well, with the assistance of the counsel's closing argument and weaving through facts with instructions, I mean, it's easy to argue that he didn't have the intent. Well, I think counsel made an effort at that. Whether it's the same effort I would have made, that's a different matter. But to judge by a juror note, it wasn't clear to the jury. But then they got an additional instruction that you may consider evidence whether a defendant believed that he could accomplish the objective of the conspiracies. So it seems like to the extent you wanted to argue that he didn't have the intent because it was all a swindle, you got the instruction that would allow for that argument. Well, I think that the instruction that was given, and if you look at the discussion that happened at the time, was all as to the idea of impossibility. Well, could he have actually accomplished this? And government counsel was taking the position throughout, well, impossibility doesn't matter. It doesn't matter if he could actually accomplish that. That wasn't the instruction. The first instruction was that you have to, one becomes a member of a conspiracy by participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy. It doesn't say anything about impossibility there. Sure. But I'm talking about the additional instruction that was given really was aimed at impossibility. But, you know, there are a number of The defendant believed that he could accomplish the objectives of the conspiracy. Yes. But he's in a mental state. Why isn't that enough? I mean, you're not entitled to the exact words you ask for as long as there's a basis for your theory of defense. Well, I think that there are several answers as to why you could conclude the jury wouldn't be clear on that. One, there is under 8.26, the model instruction, an instruction when you have an agent who's undercover and pretending that goes to exactly that. Now, that suggests that the draft of the model instructions think in that context it's unclear, so it's useful to give an additional instruction. Two, government counsel wasn't clear on the law in this. While he argued in his pretrial submissions that the instructions cover this, in the next breath he said, this isn't the law. There is the Seventh Circuit case relied on by defense counsel Radomski, that's dicta. And there's no law in the Ninth Circuit that says you can't be convicted merely based on pretending. That confusion the district court picked up on. And she said, I think pretend is confusing. And government counsel may argue that just giving this name of Mr. Wong or Mr. Wang to the undercover agent is enough. And they can argue that if they want, and defense counsel can argue the opposite. And that suggests that the district court was confused on this, too. Then there's the jury note going to exactly that issue, which, of course, suggests that at least one juror is confused. It's preceded by a note, too, saying we're confused about conspiracy. And when the judge gets that note, she says, she seems to get that, well, this is exactly what the requested for instruction was going for. She says, and this is on excerpt of Record Volume 2, page 136. So I think this instruction is more appropriately given after receiving this question than it would have been before. I'm not sure that completely answers the juror's question or whether we can, I mean, certainly I can't give the jury the answer to the question because that's for the jury to decide. Well, I submit that's error. It's for the court to instruct the jury that, look, if he's just pretending, that's not enough for conspiracy. She's been asked a direct question on that, and she's confused, and understandably so because the government has taken a confusing position. So I don't think, especially when we're confronted with a jury note, that you can say, well, it was all crystal clear to the jury because it wasn't, and it wasn't cleared up. And part of the reason it wasn't cleared up is because the district court was confused as to the law. The second issue that I wanted to focus on, if there's not more questions on that issue, is with respect to the straddling issue. Which issue? I'm sorry. The due process straddling issue. Okay. Now, I think the question really here is the third prong of plain error. Is there a reasonable probability that the jury convicted based on free enactment conduct? And I think if you understand sort of in a nutshell the circumstances, it both answers that question yes, and it refutes the argument that the government made in their answer. Wouldn't it be enough if there was enough evidence in the post-enactment period that would sustain the conviction? Well, I don't think that it's enough just if there's enough evidence there. I think the question is, well, when you look at the circumstances, is there a reasonable probability that the jury convicted based on the pre-enactment conduct? That's really the question. And the thing that makes this that important in this case is, of course, the pursuit that government counsel took, the angle government counsel took in opening. Why is there a reasonable probability that the jury convicted exclusively on the basis of pre-enacted conduct, given that after December 17, 2004, there was extensive discussion about a new deal with Denny Lowe, and they had a proposal letter, and they had various negotiations. So there was ample development of that possibility after the date of enactment. And this is why, and it requires me to sort of go back and quickly sort of go through the circumstances that led up to trial, which is Mr. Chen, confronted with a potential 25-year sentence, entered into an agreement with the government where he'd be looking at three or four years if he cooperated. He pled to the missile conspiracy. He came in for a cooperation meeting. In that meeting, he said, look, the drug conspiracy was always a scam. We were just trying to scam the agent. Now, he couldn't take that position on the missile conspiracy because then, of course, his plea wouldn't stand. And so what he said is, well, the missile conspiracy, originally we intended to commit the conspiracy, but then it turned into a scam at some point along the way. And the parties went along to sentencing. The government recommended 37 to 46 months. The judge said she wouldn't accept it. Mr. Chen said, well, you know, if the judge isn't going to file a deal, we worked out. I'm innocent of this. It was all a scam. I'm going to trial. And that's the defense he put on at trial. It was all a scam. And to defeat that, one of the ways the government argued to defeat that, and they focused on over and over again in the closing, is to say, look, if it was a scam, it only became a scam somewhere around, you know, this later period of time. They're not very clear when. But they say you can convict. And based on the jury instructions, the jury had to be unanimous as to one over that. They said you can convict based on all this conduct that they pointed to, and all that conduct is pre-enactment. But there's an extra twist here, too, and that's the following. The statute's not passed until December 17, 2004. When Hamer, the undercover agent, originally reaches out to this supposed General Wang or General Wong, one of the first things General Wang or Wong says to him, I'll call him Wong, is, look, these shoulder fire missiles are seriously controlled. This is a big issue. And Hamer, and this is on November 3, 2004, says, oh, I'm not interested in missiles. Don't worry about that. There is no more mention of missiles with anybody, with anybody, Denny Lowe, James Lowe, anybody, until March 7, 2005, and that's Hamer bringing up missiles again. There is a recorded statement in February, I think it's February 2, where Wu is saying to Chen, no, missiles aren't an issue here. We're not talking about missiles. So obviously no one is conspiring at that point to import missiles. So we've got... So the notes I have suggest that right after the Wong deal fell through, Chen says, I'll find you another source. And then in December even, before the enactment date, there were some calls with Denny Lowe. And then it goes on into February. It says, according to my notes, there was discussion in Chinese. It was translated between Chen and Wu about getting shoulder-type missiles. So do you disagree? I mean, was that evidence not in the record? I do disagree. From my review of the record, and I've got to tell you, this record was tough to review. It's a very unclear trial presentation. But from my review of the record, and this is covered in my opening brief at 14 to 16, and it's also covered in footnote 2 of the reply brief, Hamer says on November 2 to General Wong, no, I'm not interested in shoulder-type missiles. These conversations with Denny Lowe happened subsequently, and there is never any clear mention that I'm looking for missiles.  There's never any mention of missiles that I saw in my review of the record. And there is this statement between Chen and Wu sort of on the side in one of these meetings, no, we're not talking about missiles, in February of 2005. So the next mention of missiles is March 7 of 2005, when Hamer sends this list to Wu. And then in April, about April 8 or something, Wu responds with this proposal for non-engagement or some strange language like this is kind of throwing out some terms. We'll see what happens. I forget the exact words. And only then do they start talking about missiles again. One of the things, I'm sorry, go ahead. I was just going to say I don't understand how that affects the argument because all of that is post-enactment. You're referring to something that happened in December of 2004? Well, what I'm saying is that there is pre-enactment conduct talking about missiles up until November 2 of 2004. Then the missiles stuff is not talked about. Okay, but there was conduct. There was discussion of missiles after the enactment. In March of 2005. Right. They get back to it. Well, isn't that enough? Well, except that is the point at which Mr. Chen has said in his debriefing session that there was a scam, certainly. Well, that's the government's position, too. Look, if there was a scam, it arose in March of 2005. So if there is no effective conspiracy conduct before that time, and the government's acknowledging that if there was a scam it was in March of 2005, then you have no, you know, that's when the synergy between the first issue and the second issue come together is the jury can be convicting based on not being told about the pretend problem, and so not realizing that that's an effective defense from March thereon, and based on conduct that happened pre-enactment or conduct that there was no conduct from November of 2004 until March of 2005. I don't think I've expressed that very clearly. But the point is that what the record shows is obviously there's no conspiracy conduct up until December 17, 2004, because there's no statute. And there's no conspiracy conduct because basically this whole talk of the missile thing is shut off from November 2004, so before the statute is even re-enacted, until March of 2005. So if there's any talk about this missile thing post-enactment, it starts in March of 2005, and that's exactly when Mr. Chen is saying, he's clearly said, this is a scam. And that's the government's position, too, is, well, if it was a scam, it wasn't a scam until March of 2005. Well, that's... But the jury could believe it was not a scam. I mean, one of the things I was struck by was there's at least one meeting in June where they note that the deal that they're currently working out doesn't include his commission, and they suggest to Hamer that he pays after the deal is consummated, which seems certainly a jury could reasonably say that's contrary to a scam because otherwise you'd want all the money up front, not a commission after the deal is consummated. Well, they keep telling him that he needs to put... You know, there's a lot of talk. Nothing's getting done. But they keep telling him, oh, you need to put money up front. You've got to pay this million-dollar bribe to the president of Cambodia's daughter. So they're trying to get him to put money up front. Now, at times are they saying, well, you know, okay, you can put it in escrow or you can do it after the fact to sort of allay his concerns? Sure. You can say that that's evidence that it was a scam, but the jury was free to believe that it wasn't, weren't they? I mean, if we were just looking at sufficiency, there would certainly be sufficient. Sure, the jury would be free to believe that. The problem here is that the jury is not told of two things. They're not told that, look, you can't convict on this pre-enactment conduct. And, of course, then there's the gap that I'm talking about where there's no talk about missiles. So if they're being rational, they wouldn't convict on that conduct. And then they're not told that they're not explicitly told, it's not made clear to them that you can't convict if he's just pretending. And so that's when you have the two things interacting and creating even a bigger problem. A properly instructed jury very well could have come out differently on this. And I think that the juror note lends support to that on the pretend thing. And then, of course, they didn't get any instruction with respect to the straddling issue. I think those two issues together create a real problem. Did the government emphasize the pre-enactment conduct during the course of its closing argument? Absolutely, they did. As a matter of fact, they said that's kind of my point as far as they said, look, even if he did try and scam him, if you look at his cooperation session statement, what he said there is that the scam didn't arise until the midst of these whole negotiations. So they said even if you buy that, this was the real McCoy from the start. That's the language they used. This was the real McCoy from the start. And they emphasized all this conduct with General Wong and other stuff. It all occurred December 13th or earlier. That's their closing argument. They didn't concede. In your briefing, you said they conceded something. What they said was even if you believe the defense argument, there's still plenty of pre-enactment conduct. So I'm not sure it goes quite that far. I don't recall if I used the word concede. If I did, that was too strong a language. They didn't concede, but they did focus on pre-enactment conduct over and over again. They said, look, this was the real McCoy from the start. So you can convict him on this, this, and this. And they submitted a jury instruction saying you've got to find an overt act. And they focused on overt acts that were pre-enactment. So I don't know how you can't say when you've taken that focus with the jury that you haven't created a reasonable probability that the jury has said, okay, well, he's saying that there was this scam. Maybe there was. Maybe there wasn't. We don't have to sort it out. We can just convict him on stuff that happened in November. There's certainly a problem. There's certainly a significant possibility that the government having chosen to take that tack. And, you know, I say it's not surprising they chose to take that tack because one thing, you know, that came up in the moot that I feel like I should make clear is nobody seemed to know about the straddle problem. No one seemed to appreciate that they had this straddling problem. The defense attorney, the government counsel. It's a little bit surprising because there was no guideline when they originally entered the plea agreement, and that's why you had this problem with the district court imposing a higher guideline because then the guideline was promulgated in the interim. And she said, well, this is the guideline. Well, now there was a guideline. But no one seemed to know about it, and that's what sort of created this problem. And the government boxed itself in to a degree. How did this conviction on this count affect this sentence? Well, the pretends issue goes to both the conspiracies. The straddling issue goes to just the missile conspiracy. It drove the whole sentence. It's 25 years minimum mandatory, and the government concedes on the drug sentence that there's a Prendier. Maybe concedes is going a little too far. They say you don't have to address the Prendier error because you've got a 25-year minimum mandatory on the missile conspiracy, so it doesn't matter. I would agree that they actually do to some level concede a Prendier error. Same thing with the base offense level for the drug offense. They say, well, you know, even if the district court erred here, it doesn't matter because the missile conspiracy drives sort of the whole sentence. So it's sort of the major issue here. Is there any evidence to the record that Chen and his partner really had no way of actually delivering on the missiles? I mean, I understand your pretend argument, but he certainly had the contacts, didn't he? I don't think he had the contacts. I think he was just making the stuff up. And, you know, when you look at the bogus documents and the silly stories, there's a lot to support that. But no, I can't, there's no evidence to prove that negative, that they absolutely couldn't do it. There is this testimony, and there's, you know, if something could have been done, presumably over a year, something more would have been done, rather than, you know, having a letter from the defense minister of Paraguay that even the government acknowledges is a fraud, you know, or saying, oh, the president of Cambodia's daughter wants a million dollars. Again, I can't do it justice. If you go through the whole record, these guys are buffoons. They're not sophisticated traffickers. And, as I emphasized in my brief, if the government thought- Well, they delivered on the meth and the cigarettes, did they not? Wu delivered on the meth, yes. But if the government thought otherwise, and I know I've emphasized this in my brief, but I think it's a good point to make in closing. If the government thought that Mr. Chen was the person that looks like, just when you look at the indictment, they wouldn't have been recommending 37 to 46 months for him. They knew this guy was a hapless con man, not a serious, serious criminal, like you'd think if you just looked at the indictment and the 25-year sentence. Thank you. Thank you, counsel. Your time has expired. We'll hear from the government. Good morning, and may it please the Court. Mark Davis for the United States. Before I get started, I would like to address a couple of errors and corrections in my brief, please. The first goes to page 17 of the government's answering brief. That's, again, page 17, where I wrote that Defendant Chen was present in April of 2004 when the first of the methamphetamine was provided to Special Agent Hamer in compensation for the first of the two cigarette loads. That was an error. Chen was not present for the delivery of the methamphetamine, which occurred on May 21st or so. He was, however, present on April 28th when the first cigarette load was provided. There was no direct evidence at trial about his presence as to the first of the meth deliveries, but as the trial record reflects, the second cigarette delivery in September of 2004 was one where Chen was present, and, in fact, that load, too, was paid for as to the so-called clearing fee in the form of a large quantity of crystal methamphetamine. So that's that correction, please. The second is at government's answering brief, page 69, in regard to the citation for United States v. Chase. I cited it as 502 Fed 2nd. It should be 503. I apologize for that. Chase was cited for the proposition the jury could disregard Mr. Chen's trial testimony and find the counterposition given the fact that the jury were to find his testimony were so implausible. Turning to the merits, I'd like to make a couple of points, but I first would like to clear up a couple of things that came up during counsel's comments, if I may. First, Chen's trial testimony, which came as somewhat of a surprise to the government, was he threw down the gauntlet and said it was a scam as to everything from the beginning. The trial evidence should be summarized as follows. This is somewhat of an unusual situation where the government's case was built largely upon recordings. Now, it's not unusual to have recordings during an investigation, but where we had a somewhat different situation here that the jury gained a great amount of insight over, and that is commonly the case somewhat lost at a very cold pellet record, is that there were recordings, a video recording of Chen's post-arrest statement that was made hours after he was arrested. Now, to boot, the arrest itself was video recorded, and that was played at trial. So the jury got to see Chen and Wu in Agent Hamer's warehouse, and when Agent Hamer gave a signal by flicking on a light switch, six ATF agents in ray jackets with guns drawn approached and arrested all three of them. As I explained, of course, Agent Hamer was arrested to continue the ruse. And then about four hours later, Mr. Chen was Mirandized and gave a statement, and that was video recorded, and excerpts of that were played for the jury as well. It bears somewhat worth a comment that one of the statements Chen made during trial was that he didn't think the agents interviewing were real. So we played the video in somewhat rebuttal fashion to show that he was arrested by a bunch of guys in ray jackets with guns, and that was a little more than he might see on TV, which is, I believe, his position. That being said, the video of his post-arrest statement was a preview that the jury got to see of what defendant was like within moments of the completion of the offense conduct. In the same setting as they might see him on a witness stand, except under the stress of having just been arrested, and at the logical point where he would say this was all a scam. He did not do that. He did not say anything like that. As a matter of fact, with respect to the missiles, he was shown the missile proposal that had been delivered by Wu on April 13th of 05, a matter of just a couple of months beforehand, and asked, what is this? And he said, that's Bob's deal. Bob was the undercover. He knew him as Bob. And, by the way, he was assisted by the services of an interpreter. So there was no question, and it wasn't contested at trial, there was no objection to the admissibility of that statement. And what did he say about that? Not that it was a scam, not that it was a swindle from the start or at any point. What he said was, in answer to the question, what would have happened if Bob had paid? Well, then he would have gotten the missiles. Now, isn't that the logical point where an honest person, notwithstanding having been involved in several crimes, would have said this is a scam, but he didn't do it? What was the evidence that he was capable of delivering on the missiles? Well, that's a good question, and we probably will never know whether Chen himself was capable, other than from what we have in the trial record, because we were hampered by the Pacific Ocean and the fact that China isn't exactly an open society with respect to our being able to investigate whether people there actually sell missiles on the black market or in some kind of illegal fashion, or in even the government's illegal perception of what might be real or permissible. But that wasn't Chen's role. Chen's role was, as he put it, a finder. Now, I'm not just saying that from what we inferred or what the jury can infer, but that's what Chen said at his proffer, and so I turn to that. I think the court knows that a lot of proffer sessions occur. There is the Revy case out of this circuit that talks about the admissibility of a proffer statement, typically in a situation where a defendant has made a contrary position and the government would introduce that in rebuttal. But that's not what Revy is limited to. There is a situation, and we prevailed on that without objection, I might add, at trial, that the government can use that affirmatively, where the defendant fronts, in effect, through counsel, my guy's going to take a contrary position to that which is stated in the proffer, and the letter allows that. So during that proffer session, it was recorded. That's a somewhat unique situation. Why? So that there could be parallelism between what happened during the offense conduct and what happened post. The jury got a complete, real-time, out-of-the-horse's-mouth, full and complete opportunity to hear and, in effect, see at times Chen at the time when it would have mattered most where he could have said this was all a scam. Did he say that at his proffer? No, not with regard to the missiles. He said things about the methamphetamine being a scam. But as far as the missiles go, he said that my job was as a finder, and that spawned the plea agreement. The plea agreement, in no uncertain terms, and his statement to Judge Fisher said in no uncertain terms, yes, I intended to be a finder, find the missiles, and they were capable of destroying aircraft and met all of the elements. As Judge Fisher conducts a very thorough plea colloquy, makes no exceptions, made none here, and asked Mr. Chen after being sworn under oath the same oath he would later take at trial, is everything you're telling me true and everything the government told you true about what you did? Yes. Now tell me in your own words what you did. I looked for people, and they were supposed to supply missiles. That's my job. I completed it. And as the court noted during counsel's argument, he later expected to be paid. On June 3rd, 2005, when he met with Agent Hamer and Tim Flaherty, posing as A.J., the weapons mercenary buyer, Wu, Chen, Hamer, and Flaherty talked about giving up, you know, who's going to get what. What about this Paraguay defense minister? I'm sorry? What about the Paraguayan defense minister? Yes. Defense counsel's characterization of the meaning of that document is not what the government argued and not what Chen meant, more important. That was a bogus document and intended to be so. Why? Because it was intended to be sent to the Chinese weapons supplier to fool them into believing there was a legitimate end user. We all need to understand that this was not just some off-the-cuff, goofy, hapless guy. It's a couple of guys who regularly smuggled things in containers who understood how you bribe customs officials and how you actually get smuggling done. Exhibit A, the cigarettes. They got two loads in through the Port of L.A. In the same kind of container that they had said and that came in at trial without objection, owner give-ups, where they take a car where someone doesn't want to make the lease payments anymore and they put them in a container and disguise it as plastic furniture or whatever other phony statement they would make in the Bill of Lading, and they ship that to China. Remember, the defendant in his second proffer, and this came in during his cross, said he had a contact in China that had asked him, I need some coke. I get 100 to 200 kilo quantities at a time. Can you look for me? Chen, at trial on cross, my questions. He said, yes, that's exactly what I did. In fact, when he was arrested on August 20th, 2005, which occurred within a short period of time after that, on video said, okay, where's the coke, Bob? Bob took out a fake brick of coke and sampling was done. They behaved as if they know how to sample and take drugs back to their suppliers. I digress. Back to the question of the Paraguay letter. Immediately, General Wong told Bob that I will not participate in a weapons sale until we know who the end user is. And as Wong put it, it was complicated. That's in his email. Why was it complicated? Because Bob basically was some guy who Wong had no assurance was a legitimate potential guy who's not going to rat him out. The Chinese government would not sell to the United States, that's in the record, or to Canada. But there were countries to which the government would sell or the suppliers would make their transfer. That's what the end user certificate discussion was all about and why the phony Paraguay letter was created. That letter was intended to fool the suppliers, not fool Chen, not fool Bob, or not fool Wu. So I would like to add something to this about this sort of scam thing that evolved. It was not 100% turns to a scam, and that's not a correct statement by counsel. The government never argued that. This was a hybrid. The record was very clear, despite what counsel said, that in March of 05, according to Agent Trevino's testimony, defendant first mentioned James Lowe, who was not Denny Lowe. Denny Lowe was the first guy that Bob talked to back in December and then over the 12-17-04 enactment date in January and then in March, several times I might add. James Lowe was a guy that the defendant said that he had met in China and asked, can you provide a source for weapons? And James Lowe said, if in effect Bob is wagging his tail so hard to get weapons and we can't get them, why don't we just swindle him? When did that happen? It happened in March of 05, three-and-a-half months after the enactment date. It was not an absolute shift from a bona fide conspiracy and intent to deliver to a scam. It was a hybrid. It was an alternative plan, and it wasn't even Chen's idea. And this came in without objection, and there was no contrary evidence at trial. So what we had was this hybrid alternative. Let me address another point the court raised that had to do with whether it was a scam because no money was ever exchanged. Counsel said that there were repeated requests for money. That's entirely wrong. It was just the opposite, and that lent credence to the validity of the scam. No less a scam that involved extremely serious conduct. People don't just goof around and mess around when it comes to supplying missiles. No less a couple of guys experienced in contraband trafficking. They never asked for any money. Instead, ultimately, and not until June or so, did they say, well, we would like some kind of assurance in the form of an escrow. Had it been a scam, why wouldn't they try to rip him off earlier, take a few bucks and split? That never happened. Bob was never asked for money. He never made an offer for money. He didn't need to do that. Why not? Because Chen said very clearly in his post-arrest statement and otherwise, he didn't expect to get paid until the missiles were delivered. So opposing counsel references the bribe money that was requested for the Cambodian. Right. Yes. That was part and parcel, I think, of, at least in the context of the trial, the entire effort that Chen and Wu were trying to make without Bob's involvement. With respect to people they were dealing with in China, to try and convince the supplier that there was a legitimate end user, that is a friendly, if you will, that the supplier would, in an ordinary course, if you can put it that way, sell its missiles. Now, that was just something that came in and was like a flash in the pan kind of a comment. It was, I think, pretty much dismissed by everybody, including Wu and Chen, because there was very little said about it. When it occurred, and nothing about it later. More important, though, is the entire context that the court is focused in on. And let me turn to that straddling issue, just to make perfectly clear. This was not a situation where Wu or Chen ever withdrew. And irrespective of what Hamer might have been doing at any given moment, who cares? Because as they have- In closing argument, what conduct did you emphasize to the jury- Sure. That he was part of this conspiracy from- From the start to the finish? Mm-hmm. All of it. But let me address a point I know Your Honor is dealing with, and that's a question you posed to defense counsel. And that is, did the government argue the pre-offense, pre-enactment conduct? Apparently the enactment issue didn't surface during the course of the trial. It wasn't, because, well, it never came up. And it shouldn't be an issue at all. And let me explain why. And what did Bonnie Hobbs, my partner, argue in respect of the pre-enactment conduct? She argued that things had occurred prior to December 17. And why? Because they were proof of overt acts of the conspiracy, and they were intended, and she argued it with the intention of showing that Chen had completed overt acts prior to that time, but more important, that it wasn't a scam at that time. Remember, we were surprised by the idea that he was- It's a good argument that there was certainly an adequate basis for the jury to disbelieve this scam theory. I think the record is very clear that the jury could juxtapose all of his pre-trial statements and all the objective evidence, photos, and what have you, with the singular, in effect, defense mounted by his own testimony. Right. But we need to make, you know, there needs to be, or you just need to persuade us that it's not reasonably certain that the jury relied on the pre-conduct, the pre-enactment conduct- Yes. In order to base its conviction of this particular count. Understood. The test is whether there's a reasonable probability that the jury relied solely on the pre-December 17 conduct. And I think if you look at the entire record, you cannot come to that conclusion. It's firstly wildly speculative, but second, more important, is that- But it depends on how the government argued it. Well, the government- To some extent. Sure. The government, during its closing, talked about all of the evidence that had been received and focused on specific pieces of evidence, including but not limited to the defendant's own post-arrest statement that he made August 2005, approximately eight and a half months, or nine, I can't do the math that fast, several months after the enactment date, as well as drawing attention to the physical and documentary evidence, including but not limited to the April 2005 documents and the weapons proposal because that was a critical piece that identified the QW2 itself. So, no, the argument was not based solely on that. And I would submit, irrespective of whether the government may have focused on any pre- or post-enactment conduct, it's just closing. It's not the evidence. The jury is free to ignore, absorb- That's true, but you sort of direct their attention to what's important. Yes. And I think it bears comment about that in respect of the fact that the defense, throughout its case, in regard to the jury issue, the instructional issue, wrapped its entire closing around the instructions that were given, which were not objectionable. And it's never been argued in this court, either, that the instructions as given were not complete. He's never said it was an abuse of discretion to give an instruction here or there. In fact, he's just said, I wish I'd also had an instruction that I liked more. And that's, I don't believe there's a legal basis for that. Counsel, I've got a question on count three, and that is whether the government offered sufficient evidence to establish that the Marble trademark was on the USPTO register. Yes. All you have is, in effect, ATF agents saying that he thought it was counterfeit. Now, that's not enough, is it? I think it is. Let me explain why. Well, first of all, the law of the circuit routinely, or uniformly rather, is that the parties can stipulate to the ultimate facts from an expert, unless it involves the defendant's mens rea. This was not a statement about mens rea. I cited- There's no stipulation here. There was a stipulation that, and I quote, Max Mews- Oh, the stipulated testimony from the ATF- Yes, I'm sorry, I apologize. But does that bind the defendant with respect to the principle requirement that the government establish that the trademark was in the register? Let me suggest it this way, if I may. The distinction the defendant, I think, is trying to draw here, and one that is without a difference, or with no difference, is if the government and the defendant had stipulated that the cigarettes are, in fact, counterfeit as defined under 18 U.S.C. 2320, that would have been okay with the defendant, at least on appeal. But it's different where it's a testimonial stipulation. So the question really becomes, is there a difference? And I submit, both under the case law as well, more importantly, to this record, there's no difference. Why? Because Agent Mews was, by stipulation, no less entered by the court over a year before trial. This is such a non-issue at trial. June 09, Judge Fischer signed off on that stip. Trial was, of course, late September 2010. Agent Mews was deemed to have been called and testified, and again there was no counter evidence, no objection, no contrary evidence, that he received training from Philip Morris, the lawful holder of the Marlboro Service Mark regarding the recognition of counterfeit Marlboro brands and cigarettes, continuing on, and determined that all items he examined were counterfeit as defined in 18 U.S.C. 2320. All items he examined included specifically not only the photographs of the counterfeit cigarettes in the September 04 load, but the physical package of the cigarettes that the jury actually, I think, passed around during the course of the trial and was able to actually look at themselves. So the question is, you know, can an expert say that's counterfeit without objection? And the answer is yes, because it doesn't go to the defendant's state of mind. So when he says counterfeit as defined in the statute, your position is that that would include a determination that it was in the principal register? Precisely right, because the statute itself builds into it as an element of the registry. So if the testimonial stipulation is to be deemed the functional equivalent, if you will, of a stipulation in fact, then it would functionally be the same thing. Counsel, thank you very much. Your time has expired. I appreciate it very much. The case just argued will be submitted for decision.
judges: O'scannlain, Paez, Ikuta